Gene H. Shioda, Bar No. 186780
James A. Kim, Bar No. 220763
Jason Y. Lie, Bar No. 233614
LAW OFFICE OF GENE H. SHIODA
5757 West Century Blvd., Suite 700
Los Angeles, California 90045
lawofficeofghs@yahoo.com
Telephone: (310) 348-7222
Fax: (310) 348-7220

Attorneys for PLAINTIFF
PAUL HOA

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL HOA, an individual. | Case No. 3:12-cv-02078-EMC |
| Plaintiff, | |
| vs. | **SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |
| MATHEW CATE, in his individual, capacity; MICHAEL MARTEL, in his individual capacity; TERRI MCDONALD, in his individual capacity; BRYAN BEYER, in his individual capacity; KATHLEEN DICKINSON, in her individual capacity; MICHAEL STAINER, in his individual capacity; JEFF MACOMBER, in his individual capacity; ROBERT CALDERON, in his individual capacity; MICHAEL MARTEL, in his individual capacity; M. FOSS, in his individual capacity; K. LUTRELL, in his individual capacity; RAYMOND MATTEUCCI, in his individual capacity; RICHARD RILEY, in his individual capacity; THOMAS ALIOTTO, in his individual capacity; | **COUNT I: ACTION UNDER 42 U.S.C. §1983 FOR DELIBERATE INDIFFERENCE; COUNT II: ACTION UNDER 42 U.S.C. §1983 FOR CRUEL AND UNUSUAL PUNISHMENT; COUNT III: NEGLIGENCE; COUNT IV: NEGLIGENT SUPERVISION; COUNT V: NEGLIGENT TRAINING**. |

GEORGE MOON, in his individual
capacity; RONALD CHAN, in his
individual capacity; TAMMY FOSS,
in her individual capacity; M.
CHIRILA, in his individual capacity;
W. RODRIGUEZ, in his individual
capacity; DAVID MOORE, in his
individual capacity; DAVID F.
LOPEZ , an individual; T.
GREGORY STAGNITTO, an
individual;; BRIDGE TRANSPORT,
an entity of unknown form; STAG
LEASING, INC., a California
corporation; and DOES 1 to 20,
Inclusive.

                    Defendants.

## SECOND AMENDED COMPLAINT

COMES NOW PLAINTIFF, PAUL HOA ("Plaintiff"), by and through

undersigned counsel, files this Second Amended Complaint against

DEFENDANTS: MATHEW CATE, in his individual capacity; MICHAEL

MARTEL, in his individual capacity; TERRI MCDONALD, in his individual

capacity; BRYAN BEYER, in his individual capacity; KATHLEEN

DICKINSON, in her individual capacity; MICHAEL STAINER, in his individual

capacity; JEFF MACOMBER, in his individual capacity; ROBERT CALDERON,

in his individual capacity; MICHAEL MARTEL, in his individual capacity; M.

FOSS, in his individual capacity; K. LUTRELL, in his individual capacity;

RAYMOND MATTEUCCI, in his individual capacity; RICHARD RILEY, in his

individual capacity; THOMAS ALIOTTO, in his individual capacity; GEORGE

MOON, in his individual capacity; RONALD CHAN, in his individual capacity;

TAMMY FOSS, in her individual capacity; M. CHIRILA, in his individual capacity; W. RODRIGUEZ, in his individual capacity; DAVID MOORE, in his individual capacity; ("Collectively "State Defendants") and DEFENDANTS: DAVID F. LOPEZ , an individual; T. GREGORY STAGNITTO ("Stagnitto"), an individual; MICHAEL MARTEL ("MARTEL"), an individual; BRIDGE TRANSPORT ("BT"), an entity of unknown form; STAG LEASING, INC., a California corporation (Collectively "Non-State Defendants"); and DOES 1 to 20, Inclusive, and in support thereof states the following on information and belief:

## PRELIMINARY STATEMENT AND PARTIES

1.      Defendant MATTHEW CATE ("CATE") is the Former Secretary of the California Department of Corrections and Rehabilitations.  He is sued in his individual capacity.  The CDCR is responsible for the operations of the California state prison system.  As the secretary, CATE is responsible for the operation of all the prison facilities, including the area used to load and unload goods containing the loading dock of the Prison, and is personally responsible for the policies of the personal safety of prisoners in their assigned work duties at the Prison.   He is under a legal obligation to provide and maintain a safe and healthful workplace; was required to establish, implement, and maintain an injury prevention program; to assign responsibilities to persons for the prevention of injuries; to establish a system of communicating matters related to workplace safety; to inspect, assess and control existing or potential hazards; to allocate resources for the prevention of workplace injury; to document injuries and assessment of hazards; and to survey their workplace taking into consideration history of accidents, current

safety standards, and safe work practices.

2.      Defendant Terri McDonald ("McDonald") is or was the Undersecretary of Operations of the California Department of Corrections and Rehabilitations.  McDonald is sued in McDonald's individual capacity.  The CDCR is responsible for the operations of the California state prison system.  As the Undersecretary of Operations for CDCR, McDonald is responsible for the operation of all the prison facilities, including the area used to load and unload goods containing the loading dock of the Prison as it relates with inmate safety, and is personally responsible for the policies that disregards the personal safety of prisoners in their assigned work duties at the Prison.  McDonald is under under a legal obligation to provide and maintain a safe and healthful workplace; was required to establish, implement, and maintain an injury prevention program; to assign responsibilities to persons for the prevention of injuries; to establish a system of communicating matters related to workplace safety; to inspect, assess and control existing or potential hazards; to allocate resources for the prevention of workplace injury; to document injuries and assessment of hazards; and to survey their workplace taking into consideration history of accidents, current safety standards, and safe work practices.

3.      Defendant Bryan Beyer ("BEYER") is or was the Deputy Director of Court Compliance for the California Department of Corrections and Rehabilitations.  BEYER is sued in his individual capacity.  The CDCR is responsible for the operations of the California state prison system.  As the Deputy Director of Court Compliance for CDCR, Beyer is responsible for the operation of

SECOND AMENDED COMPLAINT

all the prison facilities, including the area used to load and unload goods containing the loading dock of the Prison as it relates with inmate safety, and is personally responsible for the policies that disregards the personal safety of prisoners in their assigned work duties at the Prison as it relates to the Court compliance.

4.      Defendant Kathleen Dickinson ("Dickinson") is or was the Deputy Director of Facility Support and Adult Institutions for the California Department of Corrections and Rehabilitations.  Dickinson is sued in her individual capacity. The CDCR is responsible for the operations of the California state prison system. As the Deputy Director for Facility Support and Adult Institutions for CDCR, Dickinson is responsible for the operation of all the prison facilities, including the area used to load and unload goods containing the loading dock of the Prison as it relates with inmate safety, and is personally responsible for the policies that disregards the personal safety of prisoners in their assigned work duties at the Prison.  She is under a legal obligation to provide and maintain a safe and healthful workplace; was required to establish, implement, and maintain an injury prevention program; to assign responsibilities to persons for the prevention of injuries; to establish a system of communicating matters related to workplace safety; to inspect, assess and control existing or potential hazards; to allocate resources for the prevention of workplace injury; to document injuries and assessment of hazards; and to survey their workplace taking into consideration history of accidents, current safety standards, and safe work practices.

5.      Defendant Michael Stainer ("STAINER") is or was the Associate

SECOND AMENDED COMPLAINT

Director of Facility Operations for the California Department of Corrections and Rehabilitations.  STAINER is sued in his individual capacity.  The CDCR is responsible for the operations of the California state prison system.  As the Associate Director of Facility Operations for CDCR, STAINER is responsible for the operation of all the prison facilities, including the area used to load and unload goods containing the loading dock of the Prison as it relates with inmate safety, and is personally responsible for the policies that disregards the personal safety of prisoners in their assigned work duties at the Prison.  He is under a legal obligation to provide and maintain a safe and healthful workplace; was required to establish, implement, and maintain an injury prevention program; to assign responsibilities to persons for the prevention of injuries; to establish a system of communicating matters related to workplace safety; to inspect, assess and control existing or potential hazards; to allocate resources for the prevention of workplace injury; to document injuries and assessment of hazards; and to survey their workplace taking into consideration history of accidents, current safety standards, and safe work practices.

    6.    Defendant Jeff Macomber ("MACOMBER") is or was the Assistant Director of Operation Support for the California Department of Corrections and Rehabilitations.  MACOMBER is sued in his individual capacity.  The CDCR is responsible for the operations of the California state prison system.  As the Assistant Director of Operation Support for CDCR, MACOMBER is responsible for the operation of all the prison facilities, including the area used to load and unload goods containing the loading dock of the Prison as it relates with inmate

safety, and is personally responsible for the policies that disregards the personal safety of prisoners in their assigned work duties at the Prison.  He is under a legal obligation to provide and maintain a safe and healthful workplace; was required to establish, implement, and maintain an injury prevention program; to assign responsibilities to persons for the prevention of injuries; to establish a system of communicating matters related to workplace safety; to inspect, assess and control existing or potential hazards; to allocate resources for the prevention of workplace injury; to document injuries and assessment of hazards; and to survey their workplace taking into consideration history of accidents, current safety standards, and safe work practices.

7.      Defendant Robert Calderon ("CALDERON") is or was the Director of Office of Policy Standardization for the California Department of Corrections and Rehabilitations.  CALDERON is sued in his individual capacity.  The CDCR is responsible for the operations of the California state prison system.  As the Director of Office of Policy Standardization for CDCR, CALDERON is responsible for the policy and procedures related with the operation of all the prison facilities, including the area used to load and unload goods containing the loading dock of the Prison as it relates with inmate safety, and is personally responsible for the policies that disregards the personal safety of prisoners in their assigned work duties at the Prison.  He is under a legal obligation to provide and maintain a safe and healthful workplace; was required to establish, implement, and maintain an injury prevention program; to assign responsibilities to persons for the prevention of injuries; to establish a system of communicating matters

SECOND AMENDED COMPLAINT

related to workplace safety; to inspect, assess and control existing or potential hazards; to allocate resources for the prevention of workplace injury; to document injuries and assessment of hazards; and to survey their workplace taking into consideration history of accidents, current safety standards, and safe work practices.

8.      Defendant Michael Martel ("MARTEL") is or was the Warden at San Quentin when the Plaintiff was injured.  Based on Plaintiff's information and belief, MARTELL, who is sued in his individual capacity, is responsible for the safety of all inmate programs and inmates.  He failed to implement any policies and procedures regarding inmate safety at the dock.

9.      Defendant M. Foss ("MFOSS") is or was the Associate Warden at San Quentin when the Plaintiff was injured.  Based on Plaintiff's information and belief, FOSS, who is sued in his individual capacity, is responsible for the safety of all inmate programs and inmates.  MFOSS is responsible to ensure that there are policies and procedure in place for inmate safety for all inmate work programs.

10.      Defendant W. Rodriguez ("RODRIGUEZ") is or was the Chief Deputy Warden at San Quentin when the Plaintiff was injured.  Based on Plaintiff's information and belief, RODRIGUEZ, who is sued in his individual capacity, is responsible for the safety of all inmate programs and inmates. RODRIGUEZ is responsible to ensure that there are policies and procedure in place for inmate safety for all inmate work programs.

11.      Defendant Tammy Foss ("TFOSS") is or was the Business Manager II at San Quentin when the Plaintiff was injured.  Based on Plaintiff's information

SECOND AMENDED COMPLAINT

and belief, TFOSS, who is sued in her individual capacity, is responsible for the safety of all inmate programs and inmates and oversees these programs as the Business Manager. TFOOS is responsible to ensure that there are policies and procedure in place for inmate safety for all inmate work programs.

12.     . Defendant M. Chirila ("CHIRILA") is or was the Facility Captain at San Quentin when the Plaintiff was injured.  Based on Plaintiff's information and belief, CHIRILA, who is sued in her individual capacity, is responsible for the safety of all inmate programs and inmates and oversees these programs as the Loading Dock facility. CHIRILA is responsible to ensure that the inmates are properly trained and equipped to perform their services.

13.     Defendant Raymond Matteucci ("MATTEUCI") is or was the Supervisor at San Quentin when the Plaintiff worked.  Based on Plaintiff's information and belief, MATTEUCI, who is sued in his individual capacity, is one of the supervisors that is responsible for the safety of all inmates in the work programs and trains and educates them to do their job.  The supervisor also takes any complaints from the inmates and ensures that the proper person is informed of the complaint.  The supervisors duty and responsible is to ensure that the inmate is safe and properly conducting their work.

14.     Defendant Thomas Aliotto ("ALIOTTO") is or was the Supervisor at San Quentin when the Plaintiff worked.  Based on Plaintiff's information and belief, ALIOTTO, who is sued in his individual capacity, is one of the supervisors that is responsible for the safety of all inmates in the work programs and trains and educates them to do their job.  The supervisor also takes any complaints from

SECOND AMENDED COMPLAINT

the inmates and ensures that the proper person is informed of the complaint.  The supervisors duty and responsible is to ensure that the inmate is safe and properly conducting their work.

15.     Defendant George Moon ("MOON") is or was the Supervisor at San Quentin when the Plaintiff worked.  Based on Plaintiff's information and belief, MOON, who is sued in his individual capacity, is one of the supervisors that is responsible for the safety of all inmates in the work programs and trains and educates them to do their job.  The supervisor also takes any complaints from the inmates and ensures that the proper person is informed of the complaint.  The supervisors duty and responsible is to ensure that the inmate is safe and properly conducting their work.

16.     Defendant Ronald Chan ("CHAN") is or was the Supervisor at San Quentin when the Plaintiff worked.  Based on Plaintiff's information and belief, CHAN, who is sued in his individual capacity, is one of the supervisors that is responsible for the safety of all inmates in the work programs and trains and educates them to do their job.  The supervisor also takes any complaints from the inmates and ensures that the proper person is informed of the complaint.  The supervisors duty and responsible is to ensure that the inmate is safe and properly conducting their work.

17.     Defendant David Moore ("MOORE") is or was the Supervisor at San Quentin when the Plaintiff worked.  Based on Plaintiff's information and belief, MOORE, who is sued in his individual capacity, is one of the supervisors that is responsible for the safety of all inmates in the work programs and trains and

educates them to do their job.  The supervisor also takes any complaints from the inmates and ensures that the proper person is informed of the complaint.  The supervisors duty and responsible is to ensure that the inmate is safe and properly conducting their work.

18.     Defendant Richard Riley ("RILEY") is or was the Procurement and Services Officer II at San Quentin when the Plaintiff worked.  Based on Plaintiff's information and belief, RILEY, who is sued in his individual capacity, is one of the Officers that is responsible for the safety of all inmates in the work programs and ensures they are complying with the law.  The Officer also takes any complaints from the inmates and ensures that the proper person is informed of the complaint.

19.     Defendant K. Lutrell ("LUTRELL") is or was a Correctional Officer at San Quentin when the Plaintiff worked.  Based on Plaintiff's information and belief, LUTRELL, who is sued in his individual capacity, is one of the Correctional Officers that is responsible for the safety of all inmates in the work programs and ensures they are complying with the law.  The Correctional Officer also takes any complaints from the inmates and ensures that the proper person is informed of the complaint.

20.     Defendant David Lopez ("LOPEZ") was a resident in the City of Oakdale, Stanislaus County. At the time of this incident, Plaintiff is informed and believes, that Defendant Lopez was an employee of Defendant Stagnitto, Defendant Stagnitto is an individual doing business as Bridge Transport.

21.     Defendant T. GREGORY STAGNITTO ("STAGNITTO") was at all

relevant times an individual, residing in the Marin County, doing business under the fictitious business name of "Bridge Transport."

22.     Plaintiff is informed and believes, that at all relevant times, BRIDGE TRANSPORT ("BT"), an entity of unknown form, was a contracting party authorized and approved by CDCR and the Prison, providing services and acting in accordance with the policy and directives of defendants CDCR and the Prison.

23.     Plaintiff is informed and believes, that at all relevant times, STAG LEASING, INC. ("SL"), was a corporation formed and existing under the laws of the State of California.  Plaintiff is informed and believes that SL was a contracting party authorized and approved by CDCR and the Prison, providing services and acting in accordance with the policy and directives of defendants CDCR and the Prison.

24.     This is an action to recover damages for violations of the Plaintiff's constitutional rights by state agencies, acting under the color of law, and their contractors.

**SATISFACTION OF GOVERNMENT CODE REQUIRMENTS**

25.     Plaintiff has complied with the requirements of Government Code §§905 et seq.  This action is filed within six months of the date of rejection of Plaintiff's claim.  See Right to Sue attached hereto and marked as Exhibit "A".

**JURISDICTION AND VENUE**

26.     This is a civil action seeking damages for a violation of civil rights by the Defendants based on a federal question with accompanying state law claims. (42 U.S.C. Section 1983, et seq.; 17 U.S.C. Sections 1331 and

- 12 -

1343(1)(3)(4))

27.    This Court has jurisdiction under 17 U.S.C. section 101, et seq.; 28 U.S.C. section 1331 and 1376 (Federal Question and Supplemental Jurisdiction).

28.    This Court has personal jurisdiction over defendants in the many of the acts complained herein occurred in the State of California and in this District.

29.    Venue in this District is proper under 28 U.S.C. section 1391(b) and (c).  The acts of complained upon herein occurred in the State of California and this District.  In addition certain defendants reside and are doing business in the State of California and this district.

30.    Venue is proper in the Northern District of California with respect to Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL, SL, and Lopez.

31.    Plaintiff has performed all conditions precedent to the commencement of this action or they have occurred, including filing and serving notice of claim in compliance with state Government torts claims act as well as naming the individual defendants (in their non-state capacity) and the non-state defendants.

## STATEMENT OF THE CASE

32.    Plaintiff was convicted of a nonviolent drug related felony in the San Francisco County Superior Court. He was sentenced to 8 years at Prison, was a model inmate and was expected to be released on parole in April of 2012.

33.     Plaintiff suffered catastrophic injuries, including severed spinal cord damage, deep lacerations, fractured and crush bone damage, lacerated and crush damage to soft tissue and major organs, and damage to his lungs, leaving him on ventilation machine and permanently disabled and immobile, and continues to suffer and endure catastrophic, life threatening, debilitating, severe, and traumatic injuries.  Plaintiff is currently immobilized and suffers loss of use of all of his limbs and is assisted by ventilator to breathe.

34.     These injuries were suffered as a nonviolent inmate waiting parole at SAN QUENTIN STATE PRISON ("Prison") facility maintained and operated by CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ("CDCR") .

35.     Plaintiff is informed and believes that Defendants DAVID LOPEZ ("LOPEZ"), T. GREGORY STAGNITTO ("STAGNITTO"), BRIDGE TRANSPORT ("BT"), and STAG LEASING, INC. ("SL") (collectively, the "non-state defendants"), were private parties contracted by the state defendants, the CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL, or alternatively all of them, to provide truck and trailer with delivery services to CDCR.  Accordingly, COUNTS III, IV, and V, for tort claims of negligence, negligent supervision, and negligent training are directed at these non-state defendants only.

36.     The Prison located at San Quentin, California, in the County of Marin, and is one of many facilities maintained and operated by CDCR, that

- 14 -

currently houses inmates at double the capacity the facilities were designed to house in long term custodial detention.  The Prison built in 1852 with a design capacity to hold 3,082 inmates, as of December 2008, had a total population of 5,256 for occupancy in excess of 170 percent of the design capacity.

37.     The Prison, in order to supply its overcrowded inmate population uses several make-shift loading docks that do not use an elevated platform to keep workers on a different elevation that the trucks delivering goods.  Rather, the Prison uses several elevated ramp that permit forklifts to ride up a ramp and into a trailer that is driven in reverse up to the elevated ramp.  The trailers must have its doors open because the trailer rear must touch the edge of the elevated ramp to permit the forklifts to travel over and into the trailer.

38.     These trailers deliver essential supplies of food, water, and disposable supplies for the inmates and staff living and working in the Prison, including the Plaintiff.

39.     The  loading docks and the method of delivering supplies to the Prison has not grown to meet the explosion of inmate population, and this operational feature has suffered directly from overcrowding as all other areas of the Prison.

40.     Based on information and belief, the Prison through the acts of CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL have deliberately failed to provide the proper funding to update the loading docks and the method of

delivery to protect the inmate safety.

41.     Based on information and belief, these named defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL made a selection that moneys would not be spent on inmate safety at the loading dock but would be spent on additional prison guards and uniforms.

**The Prison Procedures at Plaintiff's Workplace**.

42.     In Prison, inmates are assigned work based on their risk factor and behavior in prison.  During the time Plaintiff was in prison, Plaintiff was considered a good inmate with no demerits, and considered a low risk factor.

43.     Accordingly, Plaintiff was assigned to work the loading docks, which provides limited access to the outside prison walls, where the loading are located and a small degree of independent movement along the established parameters of the ground level of the loading dock where trucks and trailer travel without any other person directing or slowing vehicle traffic.

44.     Trailers containing the necessary supplies used by the Prison are unloaded after the trailer doors are opened.  Depending on the truck at issue the loading of the trailers may have different methods.

45.     Trucks are required to reverse up to the loading dock so that pallets can be removed by ramp using forklifts or pallet movers.  However, depending on the type of trailer doors contained on the trailer they are either opened before the truck is reversed to the loading dock or opened at the loading dock.

46.     Plaintiff was not trained as to these methods prior to working at the loading dock.  There was no training provided to the Plaintiff as to these methods prior to working.

47.     Based on information and belief, Plaintiff alleges that training was not provided because there was deliberate indifference as to inmate safety.

48.     Based on information and belief, Plaintiff alleges that there was a or several meetings that was comprised with McDonald, BEYER, Dickinson, MACOMBER, STAINER, CALDERON, MARTEL regarding inmate safety regarding work at the loading dock to discuss including but not limited training, policies and procedures, qualifications for inmates, equipment to perform job duties, condition of the loading dock, and the Court Compliance Order.

49.      Based on information and belief, Plaintiff alleges that McDonald, BEYER, Dickinson, MACOMBER, STAINER, CALDERON, MARTEL, MFOOS, RODRIGUEZ, determined that no changes were necessary even though they were aware that there were no polices an procedures, no training for loading and unloading forklifts, and cost issues.

50.     Based on information and belief, Plaintiff alleges that the decision reached by McDonald, BEYER, Dickinson, MACOMBER, STAINER, CALDERON, MARTEL, MFOOS, RODRIGUEZ was ratified and endorsed by CATE.

51.     Based on information and belief, Plaintiff alleges that several individuals, including the Plaintiff, complained to MATTEUCI, ALIOTTO, CHIRILA, MOON, CHAN, MOORE, RILEY, LUTRELL that it was unsafe that

they should be provided additional training.

52.     Based on information and belief, Plaintiff alleges that MATTEUCI, ALIOTTO, CHIRILA, MOON, CHAN, MOORE, RILEY, LUTRELL, TFOOS, RODRIGUEZ, MFOOS, MARTEL did not provide the necessary training because they felt that the inmates did not need it and were carrying out the directives of McDonald, BEYER, Dickinson, MACOMBER, STAINER, CALDERON, MARTEL and CATE.

53.     Based on information and belief, Plaintiff alleges and believes that MATTEUCI, ALIOTTO, CHIRILA, MOON, CHAN, MOORE, RILEY, LUTRELL, TFOOS, RODRIGUEZ, MFOOS, MARTEL deliberately did not provide the training because their safety was not a concern to them.

54.     Based on information and belief, Plaintiff and the other inmates make this belief based on the fact that they were told, by MATTEUCI, ALIOTTO, CHIRILA, MOON, CHAN, MOORE, RILEY, LUTRELL, they could not speak with anyone about their worries and that they could not even speak with driver's of the commercial vehicles when they backed up the vehicles to the dock.  In essence, the inmates were told to stay quiet.

55.     There are no mirrors for drivers to check the large blindside in the rear of the trailers.

56.     Commercial companies are contracted to supply goods at the Prison. These goods are brought to the Prison by trailer trucks by outside commercial companies.

57.     Because of the lack of modern loading docks the Prison loading

docks are used at a high frequency, relatively high speed up to the loading dock and out of the area, many times a day, and drivers are not permitted to open their windows or to exit their vehicle, and the trucks leave their engine on throughout the process of delivering goods.

58.     Based on information and belief, it was a deliberate choice by the Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL to keep the loading dock in its condition because these Defendants made an election that inmate safety is not priority knowing they were doing a dangerous job and that they were at risk for a serious injury because they were inmates.

59.     Trailer trucks will be inspected by guards at or near the Prison entrance as they enter and exit the Prison.

60.     Once the trailer trucks are in the warehouse area, there are no video surveillance cameras or prison guards in the area where the trucks are unloaded.

61.     The area is covered by gravel and the elevated ramp permits forklifts to drive into the trailers to unload cargo quickly.

62.     Plaintiff alleges the only training they received, which is contested, was the operation of the forklift.

63.     There are devices used to slow vehicles down and no use of any equipment to limit or prevent movement of the trucks, such as inexpensive chocks or wooden wedges for the wheels. These devices did not exist at the Prison.

64.     Plaintiff alleged based on his information and belief, that Defendants

CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL made a conscience choice not provide the inmates who work at the loading dock with chocks or wooden wedges as they were not necessary for the inmates to the do job.  These defendants made a deliberate election that inmate safety concern was not important.

65.     In fact, Plaintiff alleges on his information and belief, other inmates, including himself, inquired about the chocks and wooden wedges with MATTEUCI, ALIOTTO, CHIRILA, MOON, CHAN, MOORE, RILEY, LUTRELL and were told that it does not make a difference and do not ask.

66.     Inmate work is supervised by MATTEUCI, ALIOTTO, CHIRILA, MOON, CHAN, MOORE, RILEY, LUTRELL, who are not CALIFORNIA or Prison employees, but contractors hired by the state of CALIFORNIA, the Prison, or CDCR.  These supervisors work according to guidelines and policies developed and enforced by the state defendants specifically: McDonald, BEYER, Dickinson, MACOMBER, STAINER, CALDERON, MARTEL, MFOOS, RODRIGUEZ, and TFOOS.

67.     Plaintiff alleges on his information and belief, there are no policies developed as it relates to inmate safety for the loading dock.

68.     Plaintiff alleges on his information and belief, the reason why there are no policies and procedures in place as it relates to inmate safety on the loading dock is based on the fact that the Defendants CATE, McDonald, BEYER,

Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL are deliberately indifferent about inmate safety.

69.    Plaintiff further alleges on his information and belief that Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL elected not to have policies and procedures in place so that they can avoid any liability.  Without any policies and procedures, the injured party would be unable to show a breach of the policies and procedures.

70.    Plaintiff alleges on his information and belief this was done by Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL to avoid any liability as it relates to inmate injuries.

71.    Each warehouse structure has 1 supervisor and between 7 to 10 working inmates.  The contact between supervisor and inmate is regulated and restricted.

72.    Plaintiff was assigned to work in the Prison's warehouse that stored food, and given the task to assist in the unloading of food from the trailer trucks.

73.    Plaintiff was not trained on the safety with any regulatory guidelines as it relates to assisting the commercial vehicles to back up to the dock, unloading a commercial vehicle, and safety.

74.     Plaintiff alleges on his information and belief that the lack of training was due to the deliberate choice by Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL not to provide training.  Plaintiff alleges on his information and belief that meetings between these individuals ensued discussing inmate safety and no policies were formulated or implemented to provide them any safety training or equipment.  The reason why no training was provided is due to the fact that these inmates and nobody cares if they get hurt or not.

75.     As an inmate, Plaintiff was paid $ 0.11 per hours of work at the Prison warehouse.

### No Care Was Given for Plaintiff's Physical Safety

76.     Plaintiff was provided limited training in the form of a single group video presentation, given work uniform (fluorescent green), and then shown the procedures used and authorized by CDCR at the prison for the unloading of cargo from the truck, which is none.  The only training given was forklift driving.

77.     The trailer trucks would back their trucks towards the ramp, stop, at which point Plaintiff or other inmates working that area were required to signal the truck driver to stop, approach the trailer from the rear, open the trailer door, step to the side and direct the truck driver to approach the ramp.

78.     Plaintiff was required to do this while the truck's engine was still running, and the driver was not permitted to exit his vehicle and inmates, including Plaintiff, were prohibited from talking with drivers' period.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

79.    No equipment was used to lock the wheels of the truck, no chocks were provided or used, and no method was available for the driver to verify whether any person was between the rear of his truck and the elevated loading dock.  This was a choice made by Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL.

80.    The procedure required high level of co-ordination and attention on the part of the truck driver.  The rules of the CDCR did not permit the truck driver to exit the vehicle, and inmates are not permitted to communicate with the truck driver other than the work-related hand signals.  This lack of communication raised the risk factor for the Plaintiff or any inmate to get seriously injured at this type of job.

81.    Prisoners are provided no method to signal stop other than their voice and no device or tool or signal is provided to them to direct truck traffic. Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL made a conscience choice not provide inmates with devices or tools to signal the truck. Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL made a deliberate choice that the inmates did not need these devices to safely do their job

- 23 -

and protect them.

82.    Even though the inmates, including the Plaintiff, requested the devices, they were not provided and no explanation was given.  Plaintiff and other inmates made this request to CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL.  Plaintiff and inmates were informed that CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS denied their request.

83.    No other persons assist in the maneuver by the truck driver to position into the unloading ramp, and the procedure is inherently dangerous for the prisoner assigned to the task because of the potential to be injured by the truck reversing into the ramp.

84.    The risk of being crushed by a truck against the fixed loading dock is apparent to all who witness the heavy truck reversing into the dock and the comparative exposure of a single person operating in the pathway of the truck and its loaded trailer.

**Truck drivers speed through the process of unloading**

85.    It is common for drivers to drive their trucks at a relatively high rate of speed inside the enclosed unloading area of the Prison.

86.    Drivers are compensated by the number of loads per day.  This financial incentive causes added lack of concern for safety issues by the drivers unloading goods at the loading docks.

**Risk of Harm Was Common Knowledge**

87.    Safety at work is an issue that concerns everyone; employers,

employees, their families and the community, including inmates and prison officials.

88.   It is general knowledge that working around trucks is a major cause of injury in the transport and storage industry.  This concern is heightened for loading and unloading docks for warehouses.

89.   As published by California State Fund, an entity created in 1914 by the California state legislature and currently the largest provider of workers' compensation insurance in the state, "One of the busiest locations at a warehouse is the loading dock."

90.   The published risks associated to loading docks by the State of California, include the following areas: "Trailers, dock levelers, and rolling doors can cause pinch points, and elevated docks pose a fall hazard.  Workers must pay attention to these hazards and focus on safety training, the proper equipment, and strict observation and supervision of work tasks."  Plaintiff was required to work in the area that elevated docks were designed to avoid, the potential of being crushed against the loading ramp.

91.   Materials readily available from government agencies, like Occupational Safety & Health Administration of the United States Department of Labor, or the State Fund provided inexpensive, practical and straight-forward information on how to manage the risks of injury associated with working around trucks.

92.   It is common knowledge that vehicles, moving in and around workplaces, have the potential to cause occupational injuries and deaths in

workplaces in the United States.

93.     These risks were deliberately avoided and failed to be taken into account by Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL because they failed to have any proper training in place for the inmates, they failed to have proper policies and procedures in place for the inmates, they failed to provide the inmates the necessary equipment to perform their job safely, and they failed to consider the requests provided by the inmates to have these items for their safety.

94.     Plaintiff alleges on his information and belief that there were meetings discussing the inmates concerns that included CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL and during those meeting a decision was made that inmate safety was not important.  These acts or non-acts rise to the level of deliberate indifference as it relates to the Plaintiff's safety while performing his loading dock work.

95.     Reversing, loading, unloading and pedestrian movement around vehicle traffic are the activities most frequently linked with workplace vehicle accidents.  Vehicle-pedestrian accidents are serious because it can easily result in severe injury or death as a result of a vehicle weighing thousands of pounds moving at speed, resulting in great force impact on unprotected pedestrians, over a

short distance and short period of time.

96.     It is generally understood, that traffic and pedestrian movement at workplaces should be designed, planned and controlled so that pedestrians and vehicles can circulate safely.

97.     The safest way to protect pedestrians is to eliminate the requirement for people and plant to operate at the same level (e.g. design the hazard out by building raised loading docks in new facilities);  provide separate footpaths or walkways and eliminate pedestrian traffic where vehicles.  Plaintiff was required to work at the same level as the truck and between the truck and a fixed platform.

98.     It is common knowledge that reversing accidents are a major cause of workplace injury and damage to vehicles, equipment and premises.  It is common knowledge that injuries can occur when people at ground level assist in unloading trailers.

99.     It is common knowledge that when persons are opening the trailer doors the engine should be stopped and the key removed.

100.   In areas where pedestrians are at risk from motor vehicles, traffic management plan are normally designed to identify any hazards, assess the risks that may be caused by people coming into contact with a hazard, and put in place risk control measures to eliminate or minimize risks.  No traffic management plan is known to have been prepared for the Plaintiff's workplace.

101.   No risk assessment for working around trucks is known to have been made by the Defendants for Plaintiff's workplace.

102.   Occupational Safety and Health Administration ("OSHA") of the

1
2
3
4
5

United States Department of Labor and the State of California - OSHA, having jurisdiction over private contracting operators like Defendants BT, SL and LOPEZ, prohibit the exact procedure implemented and required by Defendants CATE.

6

103.   CAL OSHA failed to investigate the incident in this matter.

7
8
9
10
11
12

104.   The law states: "Trucks shall not be driven up to anyone standing in front of a bench or other fixed object."  29 C.F.R. §1910.178(m)(1).  Plaintiff was required to regularly come between a running truck reversing towards a fixed elevated ramp without assistance and operated by a single driver.  Plaintiff had to perform these duties without proper training or equipment to ensure his safety.

13
14
15
16
17
18
19
20

105.   Plaintiff alleges on his information and belief that he and the other inmates were not trained and provided the necessary equipment due to the fact that Defendants did not care for their safety. There were no polices and procedure in place and after complaints were made nothing was done.  Plaintiff also alleges that due to the lack of funds that the Defendants made a choice that inmate safety can be compromised.

21
22
23
24
25
26

106.   Plaintiff further alleges on information and belief that CAL-OSHA failed to investigate the incident based on the communications from CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS informing CAL OSHA that everything was fine.

27
28

107.   Plaintiff alleges on information and belief that CAL OSHA failed to investigate the incident because CAL OSHA would have fined CATE, McDonald,

BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL for failing to maintain a safe premise for work safety.

108.   No safety procedure consistent with minimum safe practices on loading dock, no safe work practices, and no meaningful safety equipment were provided to Plaintiff.

109.   Contrary to any safety precaution: instead of providing for communications, the procedures restricted communication; instead of requiring the vehicle to be turned off, the driver was required to have engines running; instead of locking the vehicle, the plaintiff was required to open the rear doors while the vehicle could move; instead of avoiding the need to come between the truck and the loading dock, plaintiff was required to place his body in the lane of travel between the truck and the dock.

**Plaintiff Suffers Catastrophic Injury.**

110.   Plaintiff started work at the loading dock in April 2011, performing his work as required using the procedure established by the Prison.

111.   On July 27, 2011, Plaintiff was working in the loading dock at the Prison warehouse.

112.   Defendant Lopez drove his trailer truck into the Prison warehouse to drop off food supplies.

113.   Once in the loading dock, Defendant Lopez reversed his trailer truck to the loading dock ramp.  Prior to aligning the trailer to the loading dock ramp,

the rear part of the trailer must be unlocked by an inmate.

114.   Plaintiff was to unlock the rear of Defendant Lopez's trailer, while the truck was running and in the absence of any equipment to lock the wheels of the truck.

115.   Once the rear has been unlocked, Plaintiff or another inmate was to hand signal to Defendant Lopez that it is safe to align the trailer to the loading dock ramp.

116.   Prior to completing Plaintiff's unlocking task and subsequent hand signal by Plaintiff or another inmate, Defendant Lopez reversed the truck and crushed Plaintiff into the loading dock ramp.

117.   Plaintiff was positioned in the center of the loading dock.

118.   When Defendant Lopez reversed his trailer truck, an audible alert in the form of beeping noise and hazard lights was supposed to activate.  At the time of this incident, no audible alert or hazard lights was activated or was audible. Plaintiff was not provided sufficient time and space to avoid the truck.

119.   It was normal for truck driver to surge his vehicle in reverse at speeds a person near the rear could not avoid.   It was imperative under the circumstances that the driver not lose track of any persons around the vehicle prior to moving. But no equipment or procedure was in place to minimize human error.

120.   Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL failed to provide the Plaintiff and the other inmates with these devices

as alleged above.

121.   These devices were not provided as the Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL made a deliberate choice not to provide them.  This reflected by the fact that there were no policies and procedures in place for inmate safety at the time of the incident, (2) that the supervisors failed to listen to the request for the Plaintiff and other inmates for safety measures, (3) that Defendants made a conscience choice to spend money on prison guards rather than inmate safety, and (4) Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL were aware that the prisoners needed this device, but simply made a choice not to provide it based on the requests made by Plaintiff and other inmates.

122.   Plaintiff did not expect Defendant Lopez to reverse his trailer and, therefore, was unable to move safely out of the way in time to avoid the crushing force impact as the rear of the trailer surged into him.  Plaintiff was crushed by the trailer against the loading dock ramp.

123.   Plaintiff stopped breathing at the scene of accident. CPR was administrated to the Plaintiff.

124.   Plaintiff was rushed to an emergency hospital.

125.   Plaintiff injuries include but not limited to major and catastrophic

injuries to the spine cord and brain, fractured jaw, severed nerves, crushed tissue, and deep lacerations.

126.   Plaintiff is hospitalized and recovering but is unable to breathe without the assistance of a ventilation machine to assist his damaged lungs and is paralyzed without any movements in the arms or legs.

127.   Defendant Lopez did not wait for Plaintiff to unlock the rear of the trailer and get out of the way.  Defendant Lopez did not wait for Plaintiff or other inmates to provide the hand signal before reversing his trailer.  Defendant Lopez along with the Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL deliberate indifference toward inmate safety caused his trailer to crush into Plaintiff, which resulted in Plaintiff's major injuries.

128.   Plaintiff is informed and believes that no alcohol or drugs were involved in the incident, and Plaintiff is informed and believes that testing for substances were administered on the driver.

**Plaintiff's lack of training and support and the absence of any safety devices increased the danger**

129.   Plaintiff was only provided limited training and support to perform his expected assignments in the form of a video watched with a group of six inmates in one session and a uniform.  The video and the only training provided pertained to forklift driving, and not loading or unloading the commercial vehicle.

130.   The limited training did not provide any devices to slow or stop the

commercial vehicle, the limited training did not provide for the proper use of the hand signals, the limited training did not provide for the ability to speak with the truck driver to avoid any uncertainty as it relates with safety, there were no polices and procedure in place.

131.   Based on information belief, when the Plaintiff and other inmates informed Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL about this problem the inmates were ignored.

132.   Based on information and belief, Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL made a conscience choice not to supply the inmates with these safety features even though they were aware of the serious risk of injury to the inmates.

133.   Based on information and belief, Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL were aware of the serious risk as reports were provided to them by subordinates about the danger and harm to inmates, that loading docks without proper training and equipment is an ultra-hazardous activity, and these defendants attended several meetings to discuss these issues.

134.   Based on information and belief, Defendants CATE, McDonald,

BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL even though provided the information failed to make any changes to provide inmate safety.

135.   Based on information and belief, Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL made a conscience choice to recklessly disregard inmate safety by using the limited money due to the overcrowded prison for more prison guards than inmate safety.

136.   The Plaintiff was provided no instructions on hand signals, or the safe method of unloading trucks, or the non-apparent dangers of the work environment.

137.   The cost of painting drive lanes, installing mirrors, use of chocks, or requiring the driver to turn the engine off, would be negligible and pale in comparison to the cost the risk of being crushed between a trailer and the loading dock.  Thus, the Defendants made a choice that the negligible cost for safety was not warranted to protect the inmates.

138.   The training video and the work uniform has no effect on the risk of a driver forbidden from rolling down his window and not permitted to leave the vehicle, from crushing a person standing in the blindside of the trailer.

139.   Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS,

CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL accordingly did nothing to address the risk of severe injury or death to inmate workers forced to enter the blindside of a truck, the area behind the trailer and its open doors that are not visible to the driver, and expose himself to the possibility of crushing force impact against the elevated loading dock.

140.   Based on information and belief, Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL made this choice aware of the catastrophic risk of injury to Plaintiff and the other inmates by recklessly disregarding this risk to avoid spending any additional monies or even creating a policy and procedure for inmate safety.

141.   Plaintiff's injuries were directly caused by an institution suffering from inadequate resources and overpopulation, requiring the use of dangerous loading docks at a high rate of activity, without any care expended to ensure any degree of safety for inmates exposed to moving vehicles in a confined space.

**Defendants Were Aware and Deliberately Indifferent To The Risk to Plaintiff.**

142.   Since the mid-1970s, California's prison population has increased by over 750 percent, rising from approximately 20,000 inmates to an "all-time high" in October 2006 of over 170,000 inmates, with more than 160,000 housed in the state's adult prison institutions.

143.   The California legislature has recognized prison crowding as a

serious problem since at least 1987, when it convened a Blue Ribbon Commission on Inmate Population Management.  The commission issued its final report in 1990, with thirtyeight recommendations, including "alternative sanctions, and more programming [and] reentry programs."

144.   Between 1990 and 2006, more than a dozen commissions and other groups issued reports with proposals to solve the overcrowding problem in California's prison and associating overcrowding with widespread problems across all the prisons in California and directly affecting the safety of inmates.

145.   One of the most exhaustive reports completed during this period was the June 2004 report of the Corrections Independent Review Panel, which was appointed by Governor Schwarzenegger; chaired by former California Governor and Attorney General George Deukmejian noted that California's "correctional system has grown to become the largest in the nation, rivaling in size and numbers even those of most other countries," and that "[n]ot surprisingly, this massive system shows the strains of both its age and its decades-long growth."

146.   The Panel found that "[a]dult prisons are severely overcrowded, imperiling the safety of both correctional employees and inmates."

147.   In its report, the Corrections Independent Review Panel discussed three distinct measures of prison capacity: "design capacity," "operable capacity," and "maximum safe and reasonable capacity."  "Design capacity" is the term used for the past 50 years to designate the number of inmates a prison is designed to accommodate.

148.   California has never limited its prison population to 100% design

capacity, and has in some respects planned for inmate population levels that exceed 100% design capacity.  California now regularly maintains inmate populations exceeding any reasonable limits to design, operable, and beyond the maximum safe and reasonable capacity.  Some facilities hold inmates at  150 percent, 175 percent, 190 percent or 200 percent to design capacity.

149.   The "overcrowding package" is "a staff enhancement of the design bed package." The overcrowding package shows that CALIFORNIA, CDCR and CATE anticipated overcrowding of as much as 190 percent in their facilities.

150.   However, some of the facilities operated by CDCR were not designed with any provision for expansion, including the Prison that held Plaintiff because of the age of the facility.

151.   The third measure, "maximum 'safe and reasonable' capacity," refers to "the maximum number of inmates who can safely and reasonably be housed in the prison system."  This definition takes into account only "the 'safe and reasonable' capacity of individual housing units according to inmate custody levels, staffing levels, and the physical structure of the units."  Units for inmates at higher custody levels have a lower maximum safe and reasonable capacity than units for inmates who present a lower security risk.

152.   The CDCR has determined the maximum safe and reasonable capacity of the state's male prisons is . . . 179 percent of design capacity.

153.   However the standard used by CDCR, "Maximum 'safe and reasonable' capacity," does not take into account "the need for humane conditions" incorporated into design capacity, or the need for programming space

incorporated into both design and operable capacity.

154.    California's inmate population has far exceeded the design capacity of the state's prison system for over twenty-five years.   By October 2006, the state's adult prisons, excluding camps, were operating at 200.2% design capacity with 162,792 inmates.

155.    As of August 27, 2008, the population of these institutions was reduced to 195.9% design capacity with 156,352 inmates, largely as a result of shipping several thousand prisoners to Mississippi and other contract states.

156.    The current level of crowding far exceeds even the maximum safe and reasonable capacity of the California prison system, which, by CDCR's own determination, is 179% design capacity for prisons holding male prisoners.

157.    In response to the severity of the prison crowding problem, Governor Arnold Schwarzenegger, declared a state of emergency on October 4, 2006.  In his Prison Overcrowding State of Emergency Proclamation, the Governor declared that "all 33 of CDCR's prisons, including the Prison, are now at or above maximum operational capacity, and 29 of the prisons are so overcrowded that the CDCR is required to house more than 15,000 inmates in conditions that pose substantial safety risks"; that "the severe overcrowding in 29 CDCR prisons has caused substantial risk to the health and safety of the men and women who work inside these prisons and the inmates housed in them"; that "the overcrowding crisis gets worse with each passing day, creating an emergency in the California prison system"; and that "immediate action is necessary to prevent death and harm caused by California's severe prison overcrowding."

158.   The risks enumerated by the Governor in his Proclamation include "increased, substantial risk for transmission of infectious illness"; security risks caused by line-of-sight problems for correctional officers, particularly in areas where inmates are triple-bunked and in "tight quarters"; and "thousands of gallons of sewage spills and environmental contamination" from overloading the prisons' sewage and wastewater systems.

159.   In January 2007, the Little Hoover Commission, a bipartisan and independent state body charged with conducting research and preparing recommendations to improve the economy, efficiency, and service of California state government, Cal. Gov't. Code §§ 8501, 8521-8522, echoed the concerns in the Governor's State of Emergency Proclamation, stating that "California's prisons are out of space and running out of time."

160.   On June 27, 2007, the *Plata* and *Coleman* courts jointly heard oral argument were persuaded that the state had not adequately addressed its prison overcrowding crisis so as to make possible the remedying of the constitutional violations, and that consideration of a population reduction order was necessary in order to achieve that objective in both cases, both courts granted plaintiffs' motions. July 23, 2007 Order in *Plata,* 2007 WL 2122657; July 23, 2007 Order in *Coleman*, 2007 WL 2122636.

161.   Furthermore, the courts and a federal receiver has determined that overcrowding adversely impacts on the very process of implementing remedies because overcrowding, and the resulting day to day operational chaos of the CDCR, creates regular "crisis" situations which call for action on the part of the

Receivership and take time, energy, and person power away from important remedial programs.

162.   The extent of overcrowding in the California prison system, approximately 190% of systemwide design capacity, is "extraordinary" and "almost unheard of." The problem is "widespread" and "not restricted to just a few institutions. It's occurred throughout the system."

163.   In the context of prison conditions litigation "crowding" refers to the presence in a facility or prison system of a prisoner population exceeding that facility or system's capacity. *See, e.g., Doty v. County of Lassen*, 37 F.3d 540, 543 (9th Cir. 1994) (finding overcrowding where a jail's actual population exceeded its design capacity by an average of approximately fifty percent); *Hoptowit v. Ray*, 682 F.2d 1237, 1248-49 (9th Cir. 1982) (finding a penitentiary overcrowded where its population exceeded its design capacity); *see also Lareau v. Manson*, 651 F.2d 96, 99-100 (2d Cir. 1981); cf. Random House Webster's Unabridged Dictionary 482 (2d ed. 1998) (defining "crowded" as "filled to excess").

164.   A prison system's capacity is not defined by square footage alone; it is also determined by the system's resources and its ability to provide inmates with essential services such as food, air, and temperature and noise control.

165.   These standards "take into account the need for humane conditions, as well as the need to prevent violence and move inmates to and from programs, such as mental health care, education classes, and drug abuse treatment."

166.   Testimony from Jeanne Woodford, former warden at San Quentin and former acting Secretary of the CDCR; Doyle Wayne Scott, former Executive

1

2    Director of the Texas Department of Criminal Justice; Joseph Lehman, former

3    head of corrections in Pennsylvania, Washington, and Maine; and Jeffrey Beard,

4    current Secretary of the Pennsylvania Department of Corrections overwhelmingly

5    establishes not only that crowding adversely affects every aspect of prison

6    administration, forcing a constant state of crisis management.

7        167.   As a matter of judicial determination reviewing the reports from the

8    federal receiver, the court has concluded that clear and convincing evidence

9    establishes that crowding is the primary cause of the unconstitutional denial of

10   medical and mental health care to California's prisoners.  Quoting Secretary

11   Woodford, who recently administered the California prison system and who

12   shortly before that was the warden at San Quentin, "[o]vercrowding in the CDCR

13   is extreme, its effects are pervasive and it is preventing the Department from

14   providing adequate mental and medical health care to prisoners."

15       168.   Defendant CATE, the former head of the CDCR testified in court that

16   "overpopulation makes everything we do more difficult,"

17

18       169.   Prison overcrowding has created a state of emergency in California's

19   prisons, as the Governor has proclaimed. It forces prison administrators to devote

20   most of their energy to addressing crises and has overwhelmed the prison system's

21   management infrastructure.

22

23       170.   The consequences of crowding are often dangerous, and on many

24   occasions fatal. Crowding contributes to an alarming number of extreme

25   departures from the standard of care and an unacceptably high number of inmate

26   deaths that are preventable or possibly preventable.

171.   Plaintiff alleges that San Quentin is a facility operating beyond any sane limits set by design capacity, operable capacity, and beyond maximum 'safe and reasonable' capacity," and beyond any established limits to provide humane conditions, and beyond the ability to provide places for inmates to be physically safe.  The overcrowding population and the crisis mentality of the State-Defendants responsible for the Prison has created and/or aggravated the dangerous risk associated with the loading dock that Plaintiff was employed at.

172.   The risk created by the Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL 's deliberate indifference to the physical safety of Plaintiff is a direct result of a physical facility used beyond any conceivable level operational capacity, and an institution operating under a crisis mentality caused by the overcrowding population without the resources, time, or incentive to address such mundane safety issues as a lone inmate working between a truck and an elevated loading dock.  This was a choice made by these Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL that inmate safety was not important.

173.   Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY,

- 42 -

LUTRELL failed to provide the Plaintiff and the other inmates with proper

training, proper devices, policies and procedures, and guidance.  They were not

provided as the Defendants CATE, McDonald, BEYER, Dickinson, STAINER,

MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS,

CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY,

LUTRELL made a deliberate choice not to provide them.  This reflected by the

fact that there were no policies and procedures in place for inmate safety at the

time of the incident, (2) that the supervisors failed to listen to the request for the

Plaintiff and other inmates for safety measures, (3) that Defendants made a

conscience choice to spend money on prison guards rather than inmate safety, and

(4) Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER,

CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA,

MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL were

aware that the prisoners needed this device, but simply made a choice not to

provide it and stated, even though aware of the risk of harm that inmate safety was

not important.

174.   Defendants CATE, McDonald, BEYER, Dickinson, STAINER,

MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS,

CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY,

LUTRELL were aware of facts from which the inference could be drawn that a

substantial risk of serious harm existed.  Defendants were aware of the harm

presented by a lone inmate like Plaintiff working in a confined space behind a

running truck.  In fact, these Defendants CATE, McDonald, BEYER, Dickinson,

STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL aware of the risk of harm deliberately chose not provide the proper safety measures for the inmates.

175.   Defendants CATE , McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL knew of the risk Plaintiff was exposed to and that Defendants inferred that substantial harm might result from the risk that Plaintiff in fact suffered. Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL still required Plaintiff to work under the unsafe conditions  despite their knowledge of a substantial risk of serious harm. This risk was evident to Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL by the complaints made by the inmates, by reports generated to these defendants identifying the risk of harm, and discussions amongst themselves and others about the risk of harm but deliberately chose to not provide a safe place for the inmates to work.

176.   It is well known that a person can be crushed, severely injured or killed when moving close to a running truck moving in reverse.  It is well known that the risk caused by a person working in a confined space between a truck and a

fixed object, like a loading dock, is serious bodily injury and even death.

177.   To have provided no safeguards, equipment, or procedure, and instead requiring procedures that further limited the ability of the driver and the Plaintiff to communicate, to identify the location of the Plaintiff, to keep the truck engine running, and to require the high frequency of deliveries, and a short time to actually unload, Defendants  CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL  acted with deliberate indifference in the face of such knowledge and further aggravated the risk of harm actually suffered.

## COUNT I

**42 U.S.C. SECTION 1983 FOR DELIBERATE INDIFFERENCE**

**(Against State Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL)**

178.   Plaintiff incorporates herein by this reference each and every allegation contained in paragraphs 1 through 176 inclusive.

179.   Plaintiff alleges that he suffered unconstitutional conditions of confinement in violation of the Eighth Amendment's prohibition against cruel and unusual punishment, as incorporated through the Due Process Clause of the Fourteenth Amendment.

180.   Plaintiff alleges that CATE as supervisor, acted and failed to act, in a

manner to protect the safety of Plaintiff, and was deliberately indifferent to Plaintiff's Eighth Amendment rights.

181.   Plaintiff further alleges that Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL failed to provide the Plaintiff and the other inmates with proper training, proper devices, policies and procedures, and guidance.  They were not provided as the Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL made a deliberate choice not to provide them.  This reflected by the fact that there were no policies and procedures in place for inmate safety at the time of the incident, (2) that the supervisors failed to listen to the request for the Plaintiff and other inmates for safety measures, (3) that Defendants made a conscience choice to spend money on prison guards rather than inmate safety, and (4) Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL were aware that the prisoners needed this device, but simply made a choice not to provide it and stated, even though aware of the risk of harm that inmate safety was not important.

182.   The Eighth Amendment proscribes more than physically barbarous punishments. The Amendment embodies "broad and idealistic concepts of dignity,

- 46 -

civilized standards, humanity, and decency . . . ," Punishments are repugnant to the Eighth Amendment if they are incompatible with the evolving standards of decency that mark the progress of a maturing society.

183.   State defendants, each of them, acted with deliberate indifference to Plaintiff for his protected liberty interest in bodily integrity, and thus, violated the Constitution either directly, indirectly by policies instituted by them, and/or by the actions of persons directly supervised by them.

184.   These elementary principles establish the government's obligation to provide some minimal degree of safety and care for those whom it is punishing by incarceration.

185.   An inmate needs and must rely on prison authorities to safeguard his person from serious harm or provide a workplace free of substantial risks of serious harm; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death,"

186.   Plaintiff as inmate had no ability to change the work conditions he was exposed to, or to adjust the procedures he was required to perform to the exact letter under the instructions given.

187.   The deliberate indifference to the safety of prisoners constitutes the unnecessary and wanton infliction of pain to Plaintiff proscribed by the Eighth Amendment and is actionable under 42 USC§ 1983.

188.   As a result of defendants' deliberate indifference, Plaintiff was deprived of liberty and said deprivation objectively and sufficiently serious.

189.   State defendants at all relevant times, had a sufficiently culpable state of mind, in allowing the deprivation to take place, being deliberately indifferent to the Plaintiff's health and safety.

190.   Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL violated rights guaranteed under the Eighth and Fourteenth Amendments, when they acted with deliberate indifference and/or their conduct was so reckless as to be tantamount to a desire to inflict harm.

191.   The risks known to state defendants were obvious with even a modicum of inquiry into the safety of the inmates in the work assignments created by state defendants and the risks were avoidable with the exercise of minimal care, expense and thought.

192.   The risks were directly created as result of state defendants' policies of detention and confinement which purposefully avoids issues of inmate safety in favor of maximum inmate population per facility at minimum costs.  These policies were adopted, ratified, and their constitutional infirmities left unaddressed by Defendants CATE in his personal capacity; MICHAEL MARTEL, in his individual capacity; TERRI MCDONALD, in his individual capacity; BRYAN BEYER, in his individual capacity; KATHLEEN DICKINSON, in her individual capacity; MICHAEL STAINER, in his individual capacity; JEFF MACOMBER, in his individual capacity; ROBERT CALDERON, in his individual capacity; MICHAEL MARTEL, in his individual capacity; M. FOSS, in his individual

- 48 -

capacity; K. LUTRELL, in his individual capacity; RAYMOND MATTEUCCI, in his individual capacity; RICHARD RILEY, in his individual capacity; THOMAS ALIOTTO, in his individual capacity; GEORGE MOON, in his individual capacity; RONALD CHAN, in his individual capacity; TAMMY FOSS, in her individual capacity; M. CHIRILA, in his individual capacity; W. RODRIGUEZ, in his individual capacity; DAVID MOORE, in his individual capacity.

193.   Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL are sued in their individual capacity for acquiescence in the constitutional deprivations of which this complaint is made and conduct that showed a reckless or callous indifference to the rights of Plaintiff and similarly situated inmates in their custodial care.

194.   Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL are liable under individual supervisor liability under §1983 when the actions and inactions in creating the reckless procedures, unsafe conditions and work assignment devoid of basic safety safeguards subjected to Plaintiff can attributed to CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL 's

participation in the training, supervision, and control of subordinates who were directly and personally involved in exposing Plaintiff to conditions that ultimately caused Plaintiff's injuries.

195.   The actions of Defendants, acting under color of state law, deprived Plaintiff of his rights, privileges, and immunities under the laws and Constitution of the United States; in particular the right to be secure in his person and property; to be free from excessive use of force, and due process.

196.   Defendants deprived Plaintiff of rights secured by the Eighth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. Section 1983.

197.   On information and belief, state Defendants undertook to provide Plaintiff with minimum safety to permit Plaintiff to perform his assigned work duties without fear from undue danger or risk.

198.   On information and belief, state defendants failed to provide Plaintiff with any tools, training, or materials to perform his work duties to avoid the risk of harm that Plaintiff suffered.

199.   On information and belief, Plaintiff alleges that state Defendants failed to train its employees adequately to permit Plaintiff to perform his work duties without risk of the harm suffered.

200.   On information and belief, Plaintiff alleges that the state Defendants' failure to properly train its employees caused the deprivation of the Plaintiff's civil rights.

201.   On information and belief, state defendants disregarded the safety of

Plaintiff and increased the risk of harm by their neglect and indifference.  No consideration was given to the safety of Plaintiff.

202.   The risk of harm was aggravated by the lack of training and neglect of demanding minimum qualifications from state defendant contracting parties and employees.

203.   The risk of harm was aggravated by the increased traffic, congested work space, lack of safety precautions or instructions, and prohibition on communications, that Plaintiff was forced to work in.

204.   As a result of the state defendants' actions and deliberate indifference, the Plaintiff was harmed.

205.   On and information and belief, Plaintiff alleges that Defendants' use of excessive force was a substantial factor in cause Plaintiff's harm.

206.   As a direct and proximate result of the state defendants' actions, Plaintiff was deprived of rights, privileges, and immunities under the Eighth and Fourteenth Amendment to the United States Constitution and the laws of the State of California.

207.   Plaintiff alleges the state defendants failed to discipline its employees for the harm caused to the Plaintiff for the violation of his civil rights, thereby causing ratifying Defendants' unlawful conduct.

208.   On information and belief, Plaintiff alleges that state defendants have engaged in outrageous conduct, which is oppressive in nature.

209.   On information and belief, Plaintiff alleges that state defendants' conduct was intended to cause serious harm to the Plaintiff, or with reckless

disregard for the Plaintiff and Plaintiff's rights.

210.   That as a direct and proximate result of the state defendants' conduct, and each of them, as described herein, proximately and directly caused Plaintiff to suffer harm.

211.   That the above described wrongful conduct of the state defendants was malicious, oppressive, and done with the conscious disregard of Plaintiff's rights and well being, justifying the imposition of punitive damages and exemplary damages in such sum as the trier of fact shall deem appropriate.

**COUNT II**

**42 U.S.C. SECTION 1983**

**(Against Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL)**

212.   Plaintiff incorporates herein by this reference each and every allegation contained in paragraphs 1 through 211 inclusive.

213.   The actions of state defendants, acting under color of state law, deprived Plaintiff of his rights, privileges, and immunities under the laws and Constitution of the United States; in particular the right to be secure in his person and property; to be free from excessive use of force, and due process.

214.   State defendants deprived Plaintiff of rights secured by the Eighth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. Section 1983.

215.   On information and belief, state defendants undertook to provide Plaintiff with minimum safety to permit Plaintiff to perform his assigned work duties without fear from undue danger or risk.

216.   On information and belief, state defendants failed to provide Plaintiff with any tools, training, or materials to perform his work duties to avoid the risk of harm that Plaintiff suffered.

217.   On information and belief, Plaintiff alleges that state defendants failed to train its employees adequately to permit Plaintiff to perform his work duties without risk of the harm suffered.

218.   On information and belief Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL failed to provide the Plaintiff and the other inmates with proper training, proper devices, policies and procedures, and guidance.  They were not provided as the Defendants CATE, McDonald, BEYER, Dickinson, STAINER, MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL made a deliberate choice not to provide them.  This reflected by the fact that there were no policies and procedures in place for inmate safety at the time of the incident, (2) that the supervisors failed to listen to the request for the Plaintiff and other inmates for safety measures, (3) that Defendants made a conscience choice to spend money on prison guards rather than inmate safety, and (4) Defendants CATE, McDonald, BEYER, Dickinson, STAINER,

- 53 -

MACOMBER, CALDERON, MARTELL, MFOSS, RODRIGUEZ, TFOSS, CHIRILA, MATTEUCI, ALIOTTO, MOON, CHAN, MOORE, RILEY, LUTRELL were aware that the prisoners needed this device, but simply made a choice not to provide it and stated, even though aware of the risk of harm that inmate safety was not important.

219.   On information and belief, Plaintiff alleges that the state defendants' failure to properly train its employees caused the deprivation of the Plaintiff's civil rights.

220.   On information and belief, state defendants disregarded the safety of Plaintiff and increased the risk of harm by their neglect and indifference.  No consideration was given to the safety of Plaintiff.

221.   The harm suffered was the result of a policy that disregards basic requirements needed to avoid substantial risks of severe injury, like the injuries sustained by Plaintiff.

222.   The risk of harm was aggravated by the lack of training and neglect of demanding minimum qualifications from state defendant contracting parties and employees.

223.   The risk of harm was aggravated by the increased traffic, congested work space, lack of safety precautions or instructions, and prohibition on communications, that Plaintiff was forced to work in.

224.   On information and belief, Plaintiff alleges that the state defendants used excessive force, and the harm constituted cruel and unusual punishment.

225.   On and information and belief, Plaintiff alleges that state defendants

were acting or purporting to act in the performance of their official duties.

226.   As a direct and proximate result of state defendants' actions, Plaintiff was arrested and or detained without justification and probable cause.

227.   As a direct and proximate result of state defendants, while Plaintiff was arrested and or detained, state defendants used excessive force without cause or reasonable justification.

228.   As a result of the state defendants' actions, the Plaintiff was harmed.

229.   On and information and belief, Plaintiff alleges that Defendants' use of excessive force was a substantial factor in cause Plaintiff's harm.

230.   As a direct and proximate result of the state defendants' actions, Plaintiff was deprived of rights, privileges, and immunities under the Eighth and Fourteenth Amendment to the United States Constitution and the laws of the State of California.

231.   Plaintiff alleges the state defendants failed to discipline its employees for the harm caused to the Plaintiff for the violation of his civil rights, thereby causing ratifying Defendants' unlawful conduct.

232.   On information and belief, Plaintiff alleges that state defendants have engaged in outrageous conduct, which is oppressive in nature.

233.   On information and belief, Plaintiff alleges that state defendants' conduct was intended to cause serious harm to the Plaintiff, or with reckless disregard for the Plaintiff and Plaintiff's rights.

234.   That as a direct and proximate result of the state defendants' conduct, and each of them, as described herein, proximately and directly caused Plaintiff to

suffer harm.

235.   That the above described wrongful conduct of the state defendants was malicious, oppressive, and done with the conscious disregard of Plaintiff's rights and well being, justifying the imposition of punitive damages and exemplary damages in such sum as the trier of fact shall deem appropriate.

## COUNT III

## NEGLIGENCE

## (Against non-state Defendants)

236.   Plaintiff incorporates herein by this reference each and every allegation contained in paragraphs 1 through 235  inclusive.

237.   On information and belief, Plaintiff alleges non-state defendants had a duty imposed by law to act reasonably to avoid foreseeable harm to persons like the plaintiff.

238.   On information and belief, Plaintiff alleges that he was harmed or offended by the non-state defendants ' conduct.

239.   On information and belief, Plaintiff alleges that non-state defendants have engaged in outrageous conduct, which is oppressive in nature.

240.   The negligent acts and omissions were the direct and proximate cause of Plaintiff's injuries, damages and losses to the Plaintiff; and, the Plaintiff is entitled to recover against the non-state defendants for damages caused by their negligence as set forth in this Complaint.

241.   That the above described wrongful conduct of the non-state defendants was malicious, oppressive, and done with the conscious disregard of

Plaintiff's rights and well being, justifying the imposition of punitive damages and exemplary damages in such sum as the trier of fact shall deem appropriate.

## COUNT IV

## NEGLIGENT SUPERVISION

### (Against non-state defendants )

242.   Plaintiff realleges and incorporates by reference each and every allegation of paragraph 1 through 241 as more fully set forth herein.

243.   The non-state defendants are required to supervise the actions of its employees and contracting parties.

244.   The defendants created an unreasonable risk of harm to the Plaintiff by failing to adequately supervise, control, or otherwise monitor the activities of its employees and agents, LOPEZ and STAGNITTO.

245.   The non-state defendants  caused damages by way of its negligent supervision; and Plaintiff is entitled to recover against defendants for his injuries, damages and losses caused by defendants' conduct as set forth herein.

246.   Non-state defendants acted with oppression, fraud, and malice toward Plaintiff, in that they intended to cause injury to Plaintiff; they acted with willful and conscious disregard for the rights and safety of Plaintiff; and the defendant, in its attempt to conceal its conduct, intentionally made misrepresentations, committed deceit, and concealed material facts with the intention of depriving Plaintiff of his legal rights and causing him injury.

## COUNT V.

## NEGLIGENT TRAINING

**(Against non-state defendants )**

247.   Plaintiff realleges and incorporates by reference each and every allegation of paragraph 1 through 246 as more fully set forth herein.

248.   The non-state defendants are required to supervise the actions of its employees and contracting parties.

249.   The defendants created an unreasonable risk of harm to the Plaintiff for failing to adequately train its employees, defendants LOPEZ and STAGNITTO.

250.   The non-state defendants  caused injuries, damages and losses to the Plaintiff by virtue of its negligent training; and, the Plaintiff is entitled to recover against the non-state defendants  for the injuries, damages and losses caused by the defendant's conduct as set forth herein.

251.   In negligently training its officers, the non-state defendants acted with oppression, fraud, and malice toward Plaintiff, in that they intended to cause injury to Plaintiff; they acted with willful and conscious disregard for the rights and safety of Plaintiff; and the defendant, in its attempt to conceal its conduct, intentionally made misrepresentations, committed deceit, and concealed material facts with the intention of depriving Plaintiff of his legal rights and causing him injury.

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, jointly and severally, as follows:

1.  For general damages;

SECOND AMENDED COMPLAINT

2. For special damages;

3. For punitive damages;

4. For all remedies available for compensatory and exemplary damages;

5. For prejudgment interest according to law;

6. For Plaintiffs' costs and disbursement in this action, together with reasonable attorneys' fees incurred herein;

7. For such other and further relief as the Court may deem just and proper.

8. Plaintiff demands a Jury Trial.


Dated: March 25, 2013          LAW OFFICE OF GENE H. SHIODA

By:        /James A. Kim/

Gene H. Shioda
James Alexander Kim
Attorneys for PLAINTIFF PAUL HOA

- 59 -
SECOND AMENDED COMPLAINT

EXHIBIT A



C A L I F O R N I A
Victim Compensation & Government Claims Board

STATE OF CALIFORNIA
EDMUND G. BROWN JR., Governor

**GOVERNMENT CLAIMS PROGRAM**
400 R Street, 5th Floor ♦ Sacramento, California 95811
Mailing Address: P.O. Box 3035 ♦ Sacramento, California 95812
Toll Free Telephone Number 1-800-955-0045 ♦ Fax Number: (916) 491-6443
Internet: www.vcgcb.ca.gov

ANNA M. CABALLERO
Secretary
State and Consumer Services Agency
Chairperson
JOHN CHIANG
State Controller
Board Member
MICHAEL A. RAMOS
San Bernardino County District Attorney
Board Member
JULIE NAUMAN
Executive Officer

Jason Yau Lie
Attorney At Law
3700 Wilshire Blvd Suite 645
Los Angeles, CA  90010

October 28, 2011

RE:  Claim G599627 for Paul Hoa

Dear Jason Lie,

The Victim Compensation and Government Claims Board rejected your claim at its hearing on
October 20, 2011.

If you have questions about this matter, please mention letter reference 123 and claim number G599627 when
you call or write your claim technician or analyst at (800) 955-0045.

Sincerely,

Jacqueline B. Tinetti,  Program Manager
Government Claims Program
Victim Compensation and Government Claims Board

cc:   Corrections and Rehabilitation

Warning
Subject to certain exceptions, you have only six months from the date this notice was personally delivered or
deposited in the mail to file a court action on this claim.  See Government Code Section 945.6.  You may seek
the advice of an attorney of your choice in connection with this matter.  If you desire to consult an attorney, you
should do so immediately.

* * * * * * * * *

It is not necessary or proper to include the Victims Compensation and Government Claims Board  (Board) in
your court action unless the Board was identified as a defendant in your original claim.  Please consult
Government Code section 955.4 regarding proper service of the summons.

Ltr 123 Claim Rejection

## CERTIFICATE OF SERVICE

Case Name:   **P. Hoa vs. M. Cate, et al.**          No.      **3:12-cv-02078-EMC**

I hereby certify that on March 25, 2013, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on March 25, 2013, at Los Angeles, California.

Vivian M. Joo                                              */s/ Vivian M. Joo*
Declarant                                                  Signature